AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
### Central District of California



LODGED
CLERK, U.S. DISTRICT COURT
5/26/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: CD  DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SILVIA IVONNE HURTADO OLIVARES and<br>MARVIN YOVANY DELGADO CHINCHILLA,<br><br>Defendant(s) | May 26, 2022<br><br>IM<br><br>Case No. 2:22-mj-02101-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of May 25, 2022, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 841(a)(1) | Possession with Intent to Distribute Controlled Substances |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Tiffany Hsieh
*Complainant's signature*

Special Agent Tiffany Hsieh
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: May 26, 2022

*Patricia Donahue*
*Judge's signature*

City and state: Los Angeles, California

Hon. Patricia Donahue, U.S. Magistrate Judge
*Printed name and title*

AUSA: Morgan J. Cohen (x2848)

**AFFIDAVIT**

I, Special Agent Tiffany Hsieh, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against Silvia Ivonne HURTADO OLIVARES ("HURTADO OLIVARES") and Marvin Yovany DELGADO CHINCHILLA ("DELGADO CHINCHILLA") for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2. This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, the "SUBJECT DEVICES"), in the custody of the Drug Enforcement Administration ("DEA"), in Los Angeles, California, as described more fully in Attachment A:

    a. One gray iPhone in a "Modelo" case ("SUBJECT DEVICE 1"); and

    b. One purple Motorola cellular phone in a semi-transparent floral case associated with telephone number (323) 618-4041 ("SUBJECT DEVICE 2").

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances, 846 (conspiracy and attempt to distribute controlled substances), and 18 U.S.C. § 924(c) (Carrying a Firearm During and in Relation to, and Possession of a Firearm in Furtherance of, a Drug Trafficking Crime) (the

"Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5. I am a Special Agent ("SA") with the DEA and am currently assigned to the Financial Investigations Group ("FIG") in the Los Angeles Field Division ("LAFD"). As such, I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

6. I was hired by the DEA in December 2021 and completed the Basic Agent Training Academy in April 2022. Prior to becoming a DEA Special Agent, I was a practicing attorney in the State of California, spending approximately five of my six years as a prosecutor in both the County of San Bernardino and the

City of Inglewood. I am currently an active member in good standing with the State Bar of California.

7. I have received training investigating violations of federal narcotics and money laundering laws, including but not limited to, Title 21, United States Code, Sections 841, 846, 952, 959 and 963, and Title 18, United States Code, Section 1956(a). I have been trained in various electronic surveillance methods, the debriefing of defendants, informants and witnesses, as well as others who have knowledge of the manufacturing, distribution, transportation, storage and importation of controlled substances and the laundering of drug proceeds.

8. Prior to becoming a DEA Special Agent, I attended a 17-week Basic Agent Academy at the DEA Training Academy in Quantico, Virginia. The Basic Agent Academy training consisted of several hundreds of hours of training that included, but was not limited to the investigation of violent crimes, racketeering, conspiracy crimes, and possession, manufacturing, distribution, importation of narcotics. Through my training, I have become familiar with narcotics traffickers' methods of operations, including the manufacture, storage, transportation, and distribution of narcotics, the collection of money that represents the proceeds of narcotics trafficking, and money laundering. I am familiar with the use of cellular phones, land-lines, computers, tablets, cameras, sim cards, and other electronic devices by narcotic traffickers. I am familiar that those electronic devices are used to communicate, facilitate,

3

and further narcotic activities with customers, co-conspirators, brokers, and sources of supplies.

9. I am familiar with the methods drug organizations employ in attempts to avoid detection by law enforcement. Some of those methods to avoid detection include, but are not limited to, the use of cellular telephone technology, the use of multiple cellphones, pre-paid calling cards, counter-surveillance measure, elaborately planned smuggling schemes tied to legitimate businesses to hide drugs and launder drug proceeds, vehicles with concealed compartments, false or fictitious identities, and coded and/or vague communications and conversations over cellphones, including text messages. I am also aware that drug traffickers drop or switch telephones and/or telephone numbers frequently to thwart law enforcement investigation of their criminal activities.

10. I have been trained in utilizing a variety of investigative techniques and resources, which include physical surveillance, electronic surveillance, analysis of telephone records, and the use of informants and cooperating sources. I have been trained in undercover operations. I have also been trained in planning and executing arrest and search warrants. Based on my experience as a prosecutor and based on my training, I have become familiar with interviewing and interrogation techniques.

### III. SUMMARY OF PROBABLE CAUSE

11. On May 24, 2022, a DEA confidential source[1] arranged via text message for the purchase of 20 pounds of methamphetamine for $1,300 per pound from HURTADO OLIVARES. The following day, HURTADO OLIVARES arrived at the pre-arranged meeting location in a white SUV, driven by DELGADO CHINCHILLA. When the CS, who was wired for audio recording, got into the SUV, HURTADO OLIVARES retrieved a cardboard box from the rear of the vehicle and presented it to the CS. The CS confirmed that the box contained the agreed-upon 20 pounds of suspected methamphetamine, and signaled to DEA agents, who were situated nearby. Upon receiving the signal, DEA agents converged on the SUV, and DELGADO CHINCHILLA stated: "I'm going to kill them." The CS then observed DELGADO CHINCHILLA "desperately" attempt to reach for something around the SUV's center console. DEA agents later searched the SUV and discovered a box containing 20 pounds of suspected methamphetamine in individually wrapped packages; SUBJECT DEVICE 1, which was discovered on the front drive-side floorboard and is believed to belong to DELGADO CHINCHILLA; SUBJECT DEVICE 2, which HURTADO OLIVARES subsequently confirmed

---

[1] The CS began working for the DEA in 2021. In or around September 2021, the CS was arrested for possession of methamphetamine. The CS is currently providing information to investigators in hopes of consideration with respect to those charges. The CS has not received monetary compensation. The CS has provided truthful information to investigators which has been independently corroborated. The CS has previously provided information to the DEA in another investigation that has been corroborated and proven to be reliable, and has not provided any information that was later determined to be false or otherwise unreliable.

belongs to her; and a loaded gun in a natural void in the SUV's center console.

## IV. STATEMENT OF PROBABLE CAUSE

12. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A. On May 24, 2022, HURTADO OLIVARES Agreed via Text Message to Sell 20 Pounds of Methamphetamine to the CS

13. Based on conversations with DEA SA Adrian Owens ("SA Owens") and DEA SA Silvana Restrepo ("SA Restrepo"), I know that on May 23, 2022, SA Owens and SA Restrepo contacted the CS and asked the CS whether the CS was aware of any significant narcotic trafficking activity in the Greater Los Angeles area. The CS stated that the CS believed that HURTADO OLIVARES was dealing narcotics based on prior conversations and interactions with HURTADO OLIVARES.

14. Based on conversations with SA Owens and SA Restrepo, as well as text messages I reviewed, I know that later in the day, the CS sent a text message to "Adrian," whom the CS believed had contact information for HURTADO OLIVARES. Adrian replied, via text message, that HURTADO OLIVARES would sell the CS 20 pounds of methamphetamine for $1,300 per pound, and then gave the CS HURTADO OLIVARES's phone number, which is the phone number associated with SUBJECT DEVICE 2.

15. Based on conversations with SA Owens and SA Restrepo, as well as text messages I reviewed, I know that on May 24, 2022, the CS arranged a drug transaction with HURTADO OLIVARES

6

via text message. The text messages were either written in Spanish or contained Spanish phrases mixed with English. SA Restrepo, who is a native Spanish speaker, translated the messages:

    a.   The CS texted HURTADO OLIVARES, "me avisas un paro," which I understand translates to, "let me know/I need a favor."

    b.   HURTADO OLIVARES texted the CS, "ok las 20," which I understand translates to, "okay twenty."

16. Based on my knowledge of this case and the context of foregoing text message exchange between the CS and HURTADO OLIVARES, I understand that "ok las 20" refers to 20 pounds of methamphetamine.

    **B.   On May 25, 2022, HURTADO OLIVARES and DELGADO CHINCHILLA Delivered Approximately 20 pounds of Suspected Methamphetamine to the CS**

17. Based on conversations with SA Owens and SA Restrepo, as well as audio recordings I reviewed, I know that on May 25, 2022, at approximately 8:19 a.m., the CS had a recorded telephone call with HURTADO OLIVARES in which HURTADO OLIVARES agreed to meet the CS at "3," at a location to be decided at a later time by the CS, to complete the methamphetamine sale. HURTADO OLIVARES told the CS that HURTADO OLIVARES wanted to meet sooner rather than later because HURTADO OLIVARES already possessed the 20 pounds of methamphetamine in a hotel room where she was staying and did not want to carry the drugs around with her. Specifically, HURTADO OLIVARES told the CS: "I already have it here and I don't want to be carrying it around. I can't even

7

get out of the room to fart especially when the stuff belongs to somebody else."

      a. Based on my training and experience, and the context of the above-described conversation, I believe that HURTADO OLIVARES wanted to meet with the CS at 3:00 p.m. to sell the CS the methamphetamine and did not feel comfortable carrying the drugs around with her because they belonged to someone else. I know that drug dealers often provide drugs to other dealers on "credit," with the expectation that they will be paid once the other dealer sells the drugs.

    18. Based on conversations with SA Owens and SA Restrepo, as well as text messages I reviewed, I know that on May 25, 2022, at approximately 3:15 p.m., the CS texted HURTADO OLIVARES with the meeting location for the drug deal: the Home Depot located at 7121 Firestone Boulevard, Downey, CA 90241.

    19. Based on conversations with SA Owens and SA Restrepo, as well as audio recordings I reviewed, I know that on May 25, 2022, at approximately 4:12 p.m., HURTADO OLIVARES called the CS from SUBJECT DEVICE 2 and stated, in a recorded telephone call, that HURTADO OLIVARES was at the meeting location in a white SUV. As soon as the CS received that call, DEA agents – who were stationed at the meeting location and conducting surveillance - observed a white Chevrolet Tahoe SUV (the "Subject Vehicle"), bearing California license plate 6AGH112, drive up and park next to the CS's car. A man, later identified as DELGADO CHINCHILLA, was driving the Subject Vehicle, and HURTADO OLIVARES was seated in the front passenger seat. The Subject Vehicle is registered

to HURTADO OLIVARES. As soon as the Subject Vehicle parked, HURTADO OLIVARES called the CS from SUBJECT DEVICE 2 and stated, in a recorded telephone call, that the CS should get into Subject Vehicle. The CS walked over to the Subject Vehicle, opened the rear door behind the front passenger side, and sat in the back of the Subject Vehicle. Unbeknownst to HURTADO OLIVARES and DELGADO CHINCHILLA, the CS was equipped with an audio recording device.

20. Based on conversations with SA Owens and SA Restrepo, reports by the CS, and audio recordings I reviewed, I know that once the CS was inside the Subject Vehicle, HURTADO OLIVARES retrieved an open cardboard box from the rear of the Subject Vehicle containing individually wrapped packages of a white crystalline substance that resembled methamphetamine. As soon as the cardboard box was presented to the CS, DELGADO CHINCHILLA stated in Spanish "look look." HURTADO OLIVARES added in Spanish, "the pretty ones," and DELGADO CHINCHILLA stated in Spanish, "they are beautiful." HURTADO OLIVARES stated in Spanish that the individually wrapped packages were not "ripped or anything." DELGADO CHINCHILLA then asked the CS about the quantity of methamphetamine that the CS typically purchased. The CS replied that the CS gets "twenty to thirty" weekly, which DELGADO CHINCHILLA said was a "very good" amount. The CS also stated that his usual source was not "coming through."

21. Based on my knowledge of the case and the context of the conversation, I believe DELGADO CHINCHILLA was asking the CS about the CS's methamphetamine sales and activities.

22. Based on conversations with SA Owens and SA Restrepo, reports by the CS, and audio recordings I reviewed, I know that upon confirming that HURTADO OLIVARES and DELGADO CHINCHILLA had brought the 20 pounds of suspected methamphetamine to sell to the CS, the CS signaled to the DEA agents stationed nearby. Upon receiving the signal, the DEA agents converged on the Subject Vehicle to arrest HURTADO OLIVARES and DELGADO CHINCHILLA.

23. Based on conversations with SA Owens and SA Restrepo, reports by the CS, and audio recordings I reviewed, I know that when the DEA agents converged on the Subject Vehicle, DELGADO CHINCHILLA stated, "nos cayeron", which I understand translates to, "we're busted." According to the CS, DELGADO CHINCHILLA also stated, "I'm going to kill them," which the CS understood was a reference to the responding DEA agents. Based on a report by the CS, I know that the CS observed DELGADO CHINCHILLA "desperately" attempt to reach for something around the SUV's center console.

24. Based on conversations with SA Owens and SA Restrepo, I know that when DEA agents ordered DELGADO CHINCHILLA to show his hands, DELGADO CHINCHILLA was slow to respond. I also know from conversations with SA Owens and SA Restrepo that the CS reported that based on DELGADO CHINCHILLA's statements and actions, as well as the totality of the circumstances, the CS believed that DELGADO CHINCHILLA was reaching for a gun.

**C. DEA Agents Discover Approximately 20 Pounds of Methamphetamine, SUBJECT DEVICES 1 and 2, and a Loaded Gun**

25. Based on conversations with SA Owens and SA Restrepo, as well as reports that I have reviewed, I know that after DEA

agents removed HURTADO OLIVARES and DELGADO CHINCHILLA from the Subject Vehicle and placed them under arrest, DEA agents searched the Subject Vehicle. During the search, DEA agents discovered the following items:

    a. A semi-open cardboard box that contained 20 individually wrapped packages, each of which contained a white, crystalline substance believed to be methamphetamine;

    b. SUBJECT DEVICE 1, which was located on the driver's seat floorboard of the Subject Vehicle and, based on that location, is believed to belong to DELGADO CHINCHILLA, who was driving the Subject Vehicle;

    c. SUBJECT DEVICE 2, which was found on top of the center console, and later confirmed to belong to HURTADO OLIVARES;

    d. A P80 polymer-style handgun bearing no serial number (commonly referred to as a "ghost gun") and loaded with 10 live rounds in the magazine that was concealed in a void underneath the center console of the Subject Vehicle; and

    e. Multiple documents related to HURTADO OLIVARES.

    **D.**    **HURTADO OLIVARES's Statements**

26. I know from conversations with SA Restrepo that she Mirandized and interviewed HURTADO OLIVARES, and that HURTADO OLIVARES made several statements during the interview, including that she:

    a. Owns and uses SUBJECT DEVICE 2;

    b. Did not consent to a search of SUBJECT DEVICE 2;

  c. Did not know to whom the proceeds of the methamphetamine sale, had it been completed, were meant to be delivered;

  d. Did not know that any drugs were in the Subject Vehicle;

  e. Often lends the Subject Vehicle to other people;

  f. Did not have cash on her person, which, in her view, suggested that she was not dealing narcotics;

  g. Did not know about drug trafficking from Mexico in the United States; and

  h. Was staying at a hotel because she had left her husband because of his drug addiction.

### V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

27. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

  a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

  b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of

illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

   c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

   d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

   e. Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

### VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

28. As used herein, the term "digital device" includes the SUBJECT DEVICES.

13

29. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat

programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

30. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

      a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

      b.    Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of

15

data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

   31.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

      a.  Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b.  In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

    c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress DELGADO CHINCHILLA's and HURTADO OLIVARES's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of DELGADO CHINCHILLA's and HURTADO OLIVARES's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

  32. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

## VII. CONCLUSION

33. For all of the reasons described above, there is probable cause to believe that HURTADO OLIVARES and DELGADO CHINCHILLA have violated 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __26th__ day of May,
2022.

*Patricia Donahue*
_____
HONORABLE PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE